UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| UNITED STATES OF AMERICA, | ) | CR. 08-30101-01-KES |
|---|---|---|
| Plaintiff, | ) ) | |
| | ) | ORDER ADOPTING REPORT |
| vs. | ) | AND RECOMMENDATION |
| | ) | ON DEFENDANT'S MOTION |
| HAROLD GEORGE VOICE, | ) | TO SUPPRESS |
| | ) | |
| Defendant. | ) | |

Defendant, Harold George Voice, is charged with one count of failure to register as a sex offender in violation of 18 U.S.C. § 2250(a). Docket 1. Voice moves to suppress the luggage and items inside the luggage that were searched and seized by Fort Thompson Chief of Police Scott Shields on October 3, 2008. Docket 13.[1]

The court referred the motion to suppress to the magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B). The magistrate judge recommends that this court deny Voice's motion to suppress. Voice objects to factual findings

---

[1] Voice asserts in his motion to suppress that the seizure and search of his luggage occurred on October 2, 2008. Docket 13. In his report and recommendation, the magistrate judge stated that the evidence submitted in the case indicated that the seizure and search occurred on October 3, 2008. Docket 29. Subsequently, in his objections to the magistrate judge's report and recommendation, Voice stated that he moved to suppress the luggage and its contents that were seized and searched on October 3, 2008. Docket 30. Based upon this chain of events, the court finds that all parties agree that the seizure and search did in fact occur on October 3, 2008.

and legal conclusions in the magistrate judge's report and recommendation. The government has not responded to Voice's objections.

**STANDARD OF REVIEW**

The court must make a de novo review "of those portions of the [Magistrate's] report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); see also United States v. Lothridge, 324 F.3d 599 (8th Cir. 2003); Jones v. Pillow, 47 F.3d 251, 253 (8th Cir. 1995). 28 U.S.C. § 636(b)(1) requires that when a party objects to the report and recommendation of a magistrate judge concerning a dispositive matter, "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id.; see also Fed. R. Civ. P. 72(b). After a de novo review of the magistrate judge's report and recommendation and a review of the record, the court adopts the report and recommendation as supplemented below.

**DISCUSSION**

**I. Factual Findings**

Voice objects to certain factual findings made by the magistrate judge.

**A. Involvement of St. John**

Voice asserts that the magistrate judge's finding that Priscilla St. John pointed to the comfort station from her backyard and told Chief Shields that

there may be bags in the building that belonged to Voice is erroneous. Voice argues that Chief Shields' written report and motion hearing testimony illustrate that instead of simply pointing to the comfort station and stating there may be bags there, St. John showed Chief Shields where Voice had been sleeping and where he was keeping his luggage inside the building.

During the motion hearing, Chief Shields testified that he arrested Voice on October 2, 2008, and that he spoke with Ronnie Wounded Knee and St. John on the following day, October 3, 2008. Docket 27 at 36-37. On direct examination, Chief Shields testified that both Wounded Knee and St. John informed him "that [Voice] frequented their residence and they believed that he was sleeping behind an abandoned building to the rear of their residence." Id. at 15. Chief Shields also testified that "St. John just pointed to the building" behind her house. Id. When asked if St. John went with him to the area to specifically show him which building she was referring to, Chief Shields responded that "[i]t was right next to it" and that "[s]he pointed to it." Id. at 19. When asked whether St. John got close enough to the building to show him the specific area where Voice was sleeping, he responded that St. John "told [him Voice] was sleeping behind the building." Id. at 22.

But on cross-examination, Chief Shields admitted that his written report stated that St. John took him to show him where Voice had been sleeping and also showed him where Voice was keeping his luggage inside the building. He

3

further admitted that before he even unzipped the bag, St. John had told him that the duffle bags were Voice's luggage. Chief Shields stated that he thought the bag may have been evidence of a burglary despite the fact that St. John had already told him that the bag belonged to Voice because the bags had the names "Darla V." and "Traversie" marked on them. Id. at 38-42.

Chief Shields testified both that St. John pointed to the building to indicate where Voice was sleeping and may have kept luggage and that St. John took him to show him where Voice had been sleeping and where Voice kept his luggage. Accordingly, based upon Chief Shields' testimony, the court finds that St. John both pointed to the building and took Chief Shields to the building. This fact does not affect the legal analysis of Voice's motion to suppress, however, and thus is not dispositive regarding any of the legal issues.

    **B.**    **Time at Which Luggage Was Found**

Voice also asserts that the magistrate judge erred in finding that after Chief Shields met with St. John, he left the area to speak with Karen Voice, and then returned to the comfort station and found two duffel bags. Voice asserts that Chief Shields found the bags for the first time when he went to the comfort station with St. John, before Chief Shields spoke to Karen Voice. Voice further asserts that after Chief Shields went to Karen Voice's residence, he

returned to the area where Voice had been sleeping and searched and seized his luggage.

Chief Shields agreed that the time line of events transpired as follows: he saw the luggage, then he went over to visit with Karen Voice, and finally he went back over to the comfort station, at which time he took photographs and seized the items. Id. at 43-44. The hearing transcript indicates some confusion on Chief Shields' part when he was asked about this specific time line. Nevertheless, based upon the whole hearing transcript, Chief Shields' testimony demonstrates that he saw the luggage, went to visit with Karen Voice, and then went back to the comfort station to take pictures and seize the items. Resolution of this factual dispute in favor of Voice, however, does not affect the legal analysis of the issues in this case.

### C. Suspected Stolen Property

Finally, Voice argues that the magistrate judge's finding that Chief Shields suspected the bags had stolen property in them is incorrect. Voice maintains that based upon Chief Shields' written report and testimony, Chief Shields knew the duffle bags were connected to Voice and that Chief Shields was not being truthful when he stated that he thought the suspected bags may have had stolen property in them.

At the hearing, Chief Shields testified that the white duffel bag had a shoulder strap that contained the named Traversie. When he saw the name

5

Traversie, he did not know if the bag was "stuff that someone had gotten from a burglary and stashed inside the building." Id. at 24. He noted that there were a couple of unsolved home invasions in the area. He indicated that at that point there was nothing connecting this bag to Voice. The gray duffle bag had the name "Darla V." written in ink on the outside of the bag. Thus, the gray bag had a different identifier on it than the white bag. Neither of the bags had identification tags on them as belonging to Voice. Id. at 24-26.

Because the bags did not identify Voice as the owner and because they displayed the names of two different people, Chief Shields' concern was that the bags may be someone's property from a home invasion or a burglary. As a result, Chief Shields put gloves on and looked inside the bags to determine whether there was anything inside the bags that would help him further identify who they belonged to. Id. at 26. He found a letter addressed to Voice in the gray bag and indicated that this was the first indication that Voice may have some connection to either of the bags. He testified that at this point, at least most or all of his concerns that the contents of the bags may be stolen property or something taken at a burglary were alleviated. He testified that he did not continue to go through the bag and look for other items but rather ceased and desisted at that point. Id. at 29.

On cross-examination, Chief Shields testified that he thought the bags might contain evidence of a burglary even though St. John told him that the

6

bags belonged to Voice because of the names on the bags. Chief Shields also stated that about 12 to 14 minutes elapsed between the time he left the comfort station to talk to Karen Voice and the time he returned to the comfort station when he searched and seized the duffel bags. Id. at 41, 47.

The court finds that the magistrate judge correctly concluded that Chief Shields suspected the bags contained stolen property. Even if St. John had told Chief Shields that the bags in the comfort station belonged to Voice, Chief Shields could have reasonably believed that the bags belonged to other individuals or contained stolen property. There were facts indicating that St. John was mistaken that the luggage belonged to Voice, such as the fact that the name Traversie appeared on the white duffel bag and the name Darla V. appeared on the gray duffel bag. Additionally, there had been unsolved home invasions in the area and it was reasonable for Chief Shields to conclude that the two duffel bags found in an unoccupied comfort station could contain stolen property.

Further, the fact that Chief Shields did not immediately search and seize the luggage does not affect this finding. Nothing in Chief Shield's testimony indicates that he saw the names Traversie and Darla V. on the bags the first time he saw them, thus alerting him that these bags could potentially contain stolen property. Instead, his testimony only revealed that when he saw the names on the bags, he suspected they may contain evidence of the home thefts

in the area. Therefore, it is reasonable to assume that after talking to Karen Voice, Chief Shields decided to further investigate the bags, discovered the names on the bags, and suspected the bags may contain stolen property. Moreover, even if Chief Shields knew that the duffel bags belonged to Voice, this still would not bear on the legal analysis of whether Voice had a reasonable expectation of privacy in the duffle bags.

## II. Legal Conclusions

Voice also objects to three legal conclusions reached by the magistrate judge when determining that Voice did not have a reasonable expectation of privacy in the luggage found in the comfort station.

### A. Case Law

Voice objects to the magistrate judge's reliance on <u>Katz v. United States</u>, 389 U.S. 347 (1967) and <u>California v. Greenwood</u>, 486 U.S. 35 (1988), in reaching the conclusion that Voice did not have a reasonable expectation of privacy in the luggage that was searched and seized by Chief Shields. Voice emphasizes that those cases involved a person exposing property to the public whereas this case does not. Voice argues that zipped luggage placed in the interior portion of a building demonstrates a reasonable expectation of privacy.

"Whether a defendant has a constitutionally protected expectation of privacy involves a two-part inquiry—the defendant must show that (1) he has a reasonable expectation of privacy in the areas searched or the items seized,

8

and (2) society is prepared to accept the expectation of privacy as objectively reasonable." United States v. James, 534 F.3d 868, 872-73 (8th Cir. 2008). Here, the magistrate judge relied upon Katz and Greenwood to conclude that Voice did not have a reasonable expectation of privacy in the comfort station where he slept because such an expectation was not objectively reasonable. The magistrate judge noted that these cases demonstrated that anything that a person knowingly exposes to the public or that is readily accessible to members of the public is not protected by the Fourth Amendment. The court agrees with the magistrate judge. Voice's luggage, which was left in the comfort station, was accessible to others. Thus, Voice had no right to exclude third persons from the comfort station because it was abandoned tribal property, which was accessible at any time by another member of the public. As such, it is irrelevant that St. John showed Chief Shields where Voice's bags were located and that Chief Shields saw the luggage, went to talk to Karen Voice, and then returned and searched and seized the luggage.

Although the court is unaware of any Eighth Circuit precedent addressing this same factual scenario, the Eighth Circuit has determined that an individual has no reasonable expectation of privacy in areas that are accessible by third persons. See United States v. McGrane, 746 F.2d 632, 634 (8th Cir. 1984) (finding that the defendant did not have a reasonable expectation of privacy in the common area of a storage locker located in the

basement of an apartment building that was accessible to all tenants and the landlord) and United States v. Eisler, 567 F.2d 814, 816 (8th Cir. 1977) (determining that the defendant had no reasonable expectation of privacy in the common hallways of his apartment building). In those cases, the court determined that an individual did not have a reasonable expectation in a common area, which presumably is more restricted in its access to third persons than an abandoned tribal comfort station.

Further, other courts have determined that the right to exclude others is an important consideration in determining whether an individual has a reasonable expectation of privacy. These courts have also determined that an individual has no expectation of privacy if the place where he left his property is accessible to third persons. See United States v. DeWeese, 632 F.2d 1267, 1270 (5th Cir. 1980) (deciding that an individual does not have a reasonable expectation of privacy in an area which is accessible to others); United States v. Jackson, 585 F.2d 653, 658 (4th Cir. 1978) (stating that an individual who keeps his effects in an abandoned shack does not have a legitimate reasonable expectation that they will remain undisturbed on these premises and therefore has no reasonable expectation of privacy); and United States v. Alewelt, 532 F.2d 1165, 1168 (7th Cir. 1976) (finding that the defendant did not have a reasonable expectation of privacy in his coat that he stored on a coat rack in the general working areas of a public building). Accordingly, based upon

existing Eighth Circuit case law and persuasive authority, the court finds that because the comfort station and consequently Voice's luggage was accessible to third persons, he did not have a reasonable expectation of privacy.

**B.    Abandoned Property**

Voice also objects to the magistrate judge's finding that Voice had abandoned the luggage and therefore no longer had an expectation of privacy to challenge the search and seizure of the luggage. Voice alleges that the fact that Chief Shields knew that Voice was keeping his luggage in the comfort station and that the luggage belonged to Voice mitigates against a finding of abandonment. Additionally, Voice argues that he was arrested within eyesight of the comfort station and therefore was involuntarily absent from the comfort station. In sum, Voice asserts that there is no evidence to establish abandonment of property.

Here, the magistrate judge found that Voice manifested an intent to shed his expectation of privacy in the duffel bags because he left the bags in the comfort station, which had been empty for over ten years. To support his conclusion, the magistrate judge relied on cases where an individual who had left property in public was deemed not to have a reasonable expectation of privacy, even though the individual had planned to retrieve the property. The court agrees with the magistrate judge's conclusion and finds that Voice

11

abandoned his luggage when he left it in a place that could be accessed by third persons, regardless of his intent to return for it.

In general, warrantless searches and seizures of abandoned property do not violate the Fourth Amendment.  United States v. Segars, 31 F.3d 655, 658 (8th Cir. 1994).  Whether a person intends to abandon property may be "inferred from words spoken, acts done, and other objective facts, and all relevant circumstances at the time of the alleged abandonment should be considered."  United States v. Hoey, 983 F.2d 890, 892 (8th Cir. 1993).  The issue "is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished [his] reasonable expectation of privacy so that a search and seizure is valid."  United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997).  Further, "[w]hether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent."  Id.  Here, Voice left his duffel bags in a vacant tribal comfort station.  Although Voice may have intended to return to his property, when he left it unattended in a place that was accessible by third persons, he no longer had a reasonable expectation of privacy in his bags.  Significantly, Chief Shields found the duffel bags unattended, without any physical indication that Voice was the owner, and in an area that third persons could freely access.

Moreover, although the court is unaware of any Eighth Circuit authority addressing this specific issue, other courts have found that an individual who leaves his personal property in a place that is accessible by third persons has abandoned his property because there is a possibility that a third person may disturb or pick up that property. See United States v. Thomas, 864 F.2d 843, 846 (D.C. 1989) (determining that an individual intended to abandon his bag when he set it in a common hallway, even if he intended to return for it, because his ability to do so would depend on whether other persons disturbed his property); United States v. Collis, 766 F.2d 219, 221-22 (6th Cir. 1985) (finding that because the defendant threw his bag over the fence, he had abandoned it and thus failed to establish a legitimate expectation of privacy in it); United States v. Jones, 707 F.2d 1169, 1172 (10th Cir. 1983) (stating that the defendant abandoned his property because his ability to retrieve the property he discarded depended on whether a third person with access to the property would take it). See also City of St. Paul v. Vaughn, 237 N.W.2d 365, 370-71 (Minn. 1975) (determining that although the defendant did not intend to relinquish ownership in his personal property, he did relinquish his reasonable expectation of privacy in his property when he hid it in a public place). Therefore, the court finds that Voice abandoned his luggage when he left it in the comfort station, which was accessible to the public.

### C. Trespasser Status

Finally, Voice objects to the magistrate judge's determination that Voice was a trespasser and as a result could not have a reasonable expectation of privacy. Voice asserts that as a tribal member, he would have a right to be on tribal land or in tribal property. Further, Voice points out that the tribe itself had abandoned any interest in the building; thus, Voice was not a trespasser. Because the court has found that Voice did not have a reasonable expectation of privacy based upon the fact that the comfort station was accessible to third persons and the fact that he abandoned his luggage, the court finds it unnecessary to resolve the issue as to whether Voice was a trespasser in the comfort station. As such, the court does not adopt the magistrate's report and recommendation in relation to this determination.

Accordingly, it is hereby

ORDERED that the court adopts the portions of the magistrate judge's report and recommendation (Docket 29) referenced above as supplemented herein and, therefore, defendant's motion to suppress (Docket 13) is denied.

Dated March 6, 2009.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE